Bruce L. Castor, III
NDOH I.D. No.: 0103252
Thomas A. Will & Associates
6000 Town Center Boulevard, Suite 106
Canonsburg, Pennsylvania 15317
Telephone: (412) 281-5110
Facsimile: (412) 315-7708
Email: bcastor@thomasawill.com

*Counsel for Petitioners*

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO – EASTERN DIVISION

| | |
|---|---|
| UNITED SOVEREIGN AMERICANS, INC. 167 Lamp and Lantern Village, Suite 194 Chesterfield, Missouri 63017 | CIVIL ACTION |
| *And* | Case No.: 5:24-cv-01359 |
| COALITION OF CONCERNED VOTERS OF OHIO P.O. Box 99 Dublin, Ohio 43017 | **PETITION FOR RELIEF IN THE FORM OF AN AMENDED WRIT OF *MANDAMUS*** |
| *And* | |
| JAMES RIGANO 8786 Wildwood Place Springboro, Ohio 45066 | |
| *And* | |
| CARRIE PERKINS 3790 White Oak Lane Wooster, Ohio 44691 | |
| *And* | |
| JACQUELINE LOUGHMAN | |

1213 Maryland Avenue SW
Canton, Ohio 44710

    *And*

JOSEPH HEALY
721 Bulen Avenue
Columbus, Ohio 43205

    *And*

MARY ANN BREJ
10723 Grand Prairie Lane
Strongsville, Ohio 44136

        *Petitioners,*

    v.

FRANK LAROSE, IN HIS OFFICIAL
CAPACITY AS THE OHIO SECRETARY
OF STATE
180 Civic Center Drive
Columbus, Ohio 43215

    *And*

DAVE YOST, IN HIS OFFICIAL CAPACITY
AS ATTORNEY GENERAL OF OHIO
Rhodes State Office Tower
30 East Broad Street, 14th Floor
Columbus, Ohio 43215

    *And*

MERRICK GARLAND, IN HIS OFFICIAL
CAPACITY AS ATTORNEY GENERAL OF
THE UNITED STATES
950 Pennsylvania Avenue NW
Washington, District of Columbia 20530

        *Respondents.*

**PETITION FOR RELIEF IN THE FORM OF AN AMENDED WRIT OF *MANDAMUS*[1]**

*To the Honorable, the Judges of Said Court:*

United Sovereign Americans, Inc., a Missouri nonprofit corporation, Coalition of Concerned Voters of Ohio, a nonpartisan public interest group, James Rigano, individually, Carrie Perkins, individually, Jacqueline Loughman, individually, Joseph Healy, individually, and Mary Ann Brej, individually, Petitioners, by counsel, Thomas A. Will & Associates, through Bruce L. Castor, III, hereby submits the within Petition for Relief in the Form of a Writ of *Mandamus*, directed to Respondents, Frank LaRose, in his Official Capacity as the Ohio Secretary of State, Dave Yost, in his Official Capacity as Attorney General of Ohio, and Merrick Garland, in his Official Capacity as Attorney General of the United States, and in support thereof hereby respectfully represents the following:

## I.    SUMMARY OF PETITIONERS' ARGUMENT

1.    Congress has outlined the minimum standards to which all states must abide in order for federal elections to be considered reliable. As outlined herein, those minimum standards were not satisfied by state election officials overseeing Ohio's 2022 General Election, rendering the corresponding certified election results unreliable.

2.    Petitioners aver that Respondents have taken insufficient measures to ensure that the 2022 performance is not repeated in subsequent federal elections and that they, along with all Ohio voters, will suffer damages if the certified election results are likewise unreliable in 2024.

---

[1] Petitioners are cognizant that Federal Rule of Civil Procedure 81(b) abolished *mandamus* actions in federal court but nonetheless authorizes "relief previously available through [writs of *mandamus*] by appropriate action or motion under these rules." F.R.C.P. 81(b). Petitioners herein are seeking relief via the All Writs Act (28 U.S.C. § 1651) and under 28 U.S.C. § 1361 (action to compel an officer of the United States to perform his duty).

3.      Absent judicial intervention, no other legal mechanism exists for Petitioners to compel Respondents to perform their ministerial duties in requiring that Ohio's federal elections be conducted in conformity with the law as Congress has set forth.

4.      Only this Court has the authority to order Respondents to bring Ohio's 2024 (and subsequent) federal elections into conformity with the minimum Congressional reliability standards, as outlined herein.

5.      Without Court action, Petitioners believe and therefore aver that Ohio's future federal elections, beginning in 2024, will continue producing unreliable results as they did in 2022.

6.      Petitioners seek this Court's intervention to ensure that only properly registered voters cast votes in Ohio's combined federal and state elections beginning in 2024.

7.      Petitioners seek this Court's intervention to ensure that only votes properly cast are counted, and counted *correctly*, in Ohio's combined federal and state elections beginning in 2024.

8.      Petitioners seek this Court's intervention to ensure that all voting systems are compliant with all infrastructure requirements and that risk assessments are completed within the actual use context, thereby assuring that every ballot is correctly and uniformly processed, as well as accurately tabulated and secured, in Ohio's combined federal and state elections beginning in 2024.

9.      Petitioners seek this Court's intervention to ensure that the authenticity of every ballot counted is proven by the maintenance of a comprehensive, unbroken chain of custody from the voter's hand to the final certified result, and that Ohio election officials maintain records of said chain of custody post-election, in compliance with all legally prescribed safeguards in Ohio's combined federal and state elections beginning in 2024.

10.     Petitioners seek this Court's intervention to ensure that Ohio's combined federal and state elections are conducted with full transparency as required by law beginning in 2024.

11.     Petitioners seek this Court's intervention in clarifying that the accepted federal definition of "to certify" means to attest that an official measurement is accurate and verified to be accurate in a strictly compliant manner, thereby directing that the "certification of elections" by Ohio election officials from 2024 onward constitutes an "attestation," ostensibly under penalty of perjury, that the certification process and the election as a whole were conducted in full adherence to applicable federal and state law.

12.     Petitioners, upon review of the authority contained herein, believe and therefore aver that federal and state law specify the requirements to which Ohio officials must conform, *at a minimum*, to properly conduct federal and state elections and prior certifying election results.

13.     Petitioners believe and therefore aver that the analysis contained herein, and exhibits incorporated by reference thereto, unequivocally confirm that the state of Ohio failed to ensure that **safeguards** were in place, as mandated by law, to ensure the integrity of Ohio's 2022 combined federal and state election and the veracity of the results.

14.     Petitioners believe and therefore aver that Ohio election officials' nonconformance with federal and state law culminated in the official certification of the 2022 election results *despite* apparent error rates exceeding those permitted by law before the results in *any* federal election may be considered unreliable.

15.     Petitioners believe and therefore aver that the exorbitant apparent error rates far in excess of the maximum permitted by law undermined the integrity of Ohio's 2022 combined federal and state election such that it was impossible to verify the accuracy of the results with any reasonable degree of confidence.

16. While Petitioners do not challenge the outcome of any 2022 Ohio election race, Petitioners believe and therefore aver that Ohio elections officials cannot state with certainty that all "winning" candidates received more votes than the corresponding "losing" candidates, as the election itself was compromised by Ohio's failure to conform to the requirements of federal law designed specifically to ensure reliable election results.

17. Petitioners believe and therefore aver that Congress mandated the maximum number of election errors which are permissible in any federal election, including Ohio's 2022 combined federal and state elections, and an error rate beyond that which Congress has deemed permissible renders an election *uncertifiable*.

18. Petitioners do not here challenge the outcome of Ohio's 2022 combined federal and state election, and Petitioners acknowledge the possibility that the "winner" received more votes than the "loser" in every contested race.

19. Petitioners believe and therefore aver, however, that Ohio officials certified the 2022 election despite the existence of *apparent* numbers of errors in excess of the Congressional limit and made no effort to investigate those apparent errors before certifying the election results as accurate.

20. **Petitioners believe and therefore aver that it is reasonable to believe that the systemic issues which marred Ohio's 2022 combined federal and state election will escalate in 2024, 2026, 2028, etc., absent intervention by this Court.**

21. Petitioners have brought the issues addressed herein to the attention of Ohio officials, who nonetheless failed, and continue to fail, to take sufficient action to ensure that the integrity of future elections is not jeopardized by the same regulatory oversights which clouded the 2022 election.

22.     Petitioners seek relief in the form of a Writ of *Mandamus* to compel Respondents to perform the *ministerial* functions necessary to rectify the reliability issues evident in the 2022 election.[2]

### A.     Ohio's 2022 Combined Federal and State Election – Unreliable Results – Improper Certification

23.     In the Help America Vote Act (*hereinafter* "HAVA"), signed into law by President George W. Bush in 2002, **Congress mandated as follows: HAVA - voting system error rate "…(5) Error RATES.—The error rate of the voting system in counting ballots (determined by taking into account only those errors which are attributable to the voting system and not attributable to an act of the voter) shall comply with the error rate standards established under section 3.2.1 of the voting systems standards issued by the Federal Election Commission which are in effect on the date of the enactment of this Act."** 52 U.S.C. § 21081.

24.     The voting standards of the Federal Election Commission (*hereinafter* "FEC") in effect at the time Congress enacted HAVA in 2002 were the Voting Systems Standards Volume I: Performance Standards (2002).

25.     Those voting standards, in effect at the time HAVA became law, allowed for the **one (1) error per 500,000 ballot *positions*.**[3]

26.     Petitioners believe and therefore aver that an error rate in excess of one (1) error per 500,000 ballot *positions* renders a federal election unreliable.

---

[2] Petitioners do not request that this Court order Respondents to exercise their *discretion* or make any decision at all apart from upholding the specific, non-discretionary legal requirements, as outlined, *inter alia*, below.

[3] As of 2021, there have been five iterations of national voting system standards. The Federal Election Commission published the first two (2) sets of federal standards in 1990 and 2002 (VSS1990 and VSS2002, respectfully). The Election Assistance Commission then adopted Version 1.0 of the Voluntary Voting System Guidelines (VVSG 1.0, or VVSG2005) on December 13, 2005. On March 31, 2015, the Election Assistance Commission approved VVSG 1.1 (VVSG2015). On February 10, 2021, the Election Assistance Commission approved VVSG 2.0 (VVSG2021).

27.     As the HAVA provision cited above remains in full effect, this designated error rate is currently the law of the United States.

28.     A "ballot *position*" refers to the number of individual "choices" a voter *could* make on a single ballot. For example, if a particular ballot has thirty (30) fill-in options, that ballot would be said to contain thirty (30) ballot positions.

29.     A voting system error occurs whenever a voting machine should have discerned an error, not made by the voter, while counting a ballot position on a scanned ballot.

30.     Experts employed by the FEC estimated that 500,000 ballot *positions* equated to 125,000 *individual ballots*.[4]

31.     Petitioners believe and therefore aver that the U.S. Election Assistance Commission (*hereinafter* "EAC") intended to clarify the meaning of 500,000 ballot *positions* in terms of how many individual ballots "make up" 500,000 ballot *positions* in order to simplify the process of discerning the number of "errors" permissible under HAVA in a given election.

32.     Petitioners believe and therefore aver (and are prepared to present expert testimony to so substantiate) that the FEC's calculation is correct and represents the proper interpretation of federal law and Congressional intent under HAVA.

33.     In the 2022 Ohio General Election, 4,201,368 individual ballots were recorded by election officials as cast. 4,201,368 divided by 125,000 equals thirty-four (34) (rounded up), which was the maximum number of errors permitted under federal law in the 2022 Ohio General Election. As such, HAVA would have permitted Ohio election officials to certify the 2022 Ohio General Election as valid only upon a showing of thirty-four (34) or fewer errors.

---

[4] *See* Election Assistance Commission Voluntary Voting System Guidelines of 2015, *U.S. Election Assistance Commission*. United States [Web Archive] Retrieved from the Election Assistance Commission, https://www.eac.gov/sites/default/files/eac_assets/1/28/VVSG.1.1.VOL.1.FINAL1.pdf.

34. Therefore, if there were more than thirty-four (34) voting system errors in the ballot tabulation for all ballots cast in the 2022 Ohio General Election (as was the case) the election results would be unreliable pursuant to HAVA.

35. Petitioners believe and therefore aver that contributing to the unreliability of Ohio's 2022 election certification is the fact that Ohio's voter registration rolls contained *more than one (1) million* potential errors at the time of the 2022 General Election.

36. These potential errors were in the form of illegal duplicate registrations, incomplete or unknown addresses, registrations on or before the registrant's date of birth, age discrepant registrants, registrations on January 1st, registrations on a federal holiday, registrations on Sunday, registrations with modified dates of birth, registrants whose voter history inexplicably changed, registrants with registration dates altered backwards, and registrants with altered "unique" state voter identification numbers.

37. While Congress may not have specifically intended for these types of errors to be included in the one (1) out of 500,000 error rate, Petitioners believe and therefore aver that this figure provides a general benchmark for what the legislature considered an acceptable degree of error in our elections.

38. These errors compromise the validity of Ohio's elections, cast doubt upon the accuracy and integrity of Ohio's currently-in-place voting systems, and undermine Ohioans' collective voting rights, all in violation of federal and state election laws.

39. Petitioners seek to redress these voter registration apparent errors, blatantly inaccurate voter registration rolls, discrepancies between votes cast and actual votes reported, and extreme voting errors generally, which collectively amount to violations of federal election laws, Ohio election laws, and fundamental voting rights contained within the United States Constitution.

40. Respondents have, despite notice, collectively refused to maintain or enforce compliance with federal and state election laws which, if remained unenforced, will cause future harm to Petitioners and all Ohio voters.

41. Petitioners believe and therefore aver that Respondents have failed to implement appropriate safeguards to adequately monitor and rectify voter roll discrepancies in furtherance of Respondents' collective duty to ensure the reliability, integrity, and accuracy of Ohio's elections.

42. Petitioners, sincerely and in good faith, have repeatedly presented evidence of potential election violations and irregularities to Respondents.

43. Despite the indisputable risk of election subversion, the state of Ohio has denied or deemphasized Petitioners' claims notwithstanding the serious nature of the issues presented and underlying factual support.

44. Petitioners seek to protect their individual rights, as well as those of every voting citizen of Ohio, to have their vote fairly counted in an open and reliable election as such elections are defined according to law as outlined below.

45. Respondents have denied Petitioners' right to a fair vote.

46. Furthermore, Respondents appear to have implemented procedures that have obscured the ability to audit the 2022 General Election, thereby rendering the outcomes factually unknowable at the time of certification.

47. Petitioners believe and therefore aver that Respondents have violated multiple federal and state laws, or negligently allowed such violations to occur, while loudly proclaiming the infallibility of Ohio's election results.

48. Respondents insist that Petitioners have adequate voting rights, while simultaneously fighting from every conceivable angle to prevent Petitioners from attempting to

protect those rights. Respondents' collective actions in refusing to address the problem extinguish and undermine the very meaning of the right to vote in a fair democracy.

49.     Respondents can and should be compelled to address compliance with existing election law, specifically: to adequately investigate the issues, prosecute anyone in violation of federal and/or state law, and actively work to bring Ohio back into compliance with federal and state election law mandates so that Ohio's constitutionally enshrined voting rights are upheld and preserved.

50.     The All Writs Act provides that "[t]he Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in the aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651.

51.     District Courts of the United States have original jurisdiction of any action in the nature of *mandamus* to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff. 28 U.S.C. § 1361.

## II.    PARTIES

52.     United Sovereign Americans, Inc., is a nonprofit corporation incorporated in the state of Missouri.

53.     Coalition of Concerned Voters of Ohio is a nonpartisan public interest group in the state of Ohio.

54.     Jim Rigano is an individual with an address of 8786 Wildwood Place, Springboro, Ohio 45066.

55.     Carrie Perkins is an individual with an address of 3790 White Oak Lane, Wooster, Ohio 44691.

56.     Jacqueline Loughman is an individual with an address of 1213 Maryland Avenue SW, Canton, Ohio 44710.

57.     Joseph Healy is an individual with an address of 721 Bulen Avenue, Columbus, Ohio 43205.

58.     Mary Ann Brej is an individual with an address of 10723 Grand Prairie Lane, Strongsville, Ohio 44136.

59.     Frank LaRose, in his Official Capacity as the Ohio Secretary of State (*hereinafter* "Secretary LaRose"), was elected to oversee the Office of the Ohio Secretary of State. He and his office are responsible for supervising the administration and compliance with Ohio's election laws, Ohio's compliance with federal law, including HAVA and the National Voter Registration Act (*hereinafter* "NVRA"), canvassing votes for all elective state offices, investigating election fraud and irregularities, compiling and maintaining election statistics and other election-related records, and training election officials.

60.     Dave Yost, in his Official Capacity as the Attorney General of Ohio, is responsible for overseeing and managing the Ohio Attorney General's Office, a government entity tasked with administering the enforcement and prosecution provisions of the Ohio Revised Code in addition to ensuring that state officials, including those acting within the Office of the Ohio Secretary of State, are complying with Ohio law.

61.     Merrick Garland, in his Official Capacity as the Attorney General of the United States (*hereinafter* "Attorney General Garland"), is the chief law enforcement official of the United States, and is responsible for overseeing and managing the United States Department of Justice, a government entity tasked with administering federal law enforcement and prosecution in addition

to ensuring that federal and state officials, including those acting within the state of Ohio, are complying with federal law.

## III.    JURISDICTION AND VENUE

62.    This Court has jurisdiction pursuant to 28 U.S.C. § 1651.

63.    This Court has jurisdiction pursuant to 28 U.S.C. § 1361.

64.    This Court additionally has subject matter jurisdiction over this complaint because the case presents substantial questions of federal law, and the state claims are so related to the federal claims that they form part of the same case or controversy. 28 U.S.C. §§ 1331 and 1367.

65.    This Court has personal jurisdiction as the Respondents are a collection of Ohio and United States government entities and officials, and the state of Ohio is within the jurisdiction of the United States.

66.    "When a state exercises power wholly within the domain of state interest, it is insulated from federal judicial review. But such insulation is not carried over when state power is used as an instrument for circumventing a federally protected right." *Gray v. Sanders*, 372 U.S. 368, 372 (1963) *citing Gomillion v. Lightfoot*, 364 U.S. 339, 347 (1960).

67.    Venue is proper in this district under 28 U.S.C. § 1391(e)(1).

## IV.    STANDING

68.    Petitioner United Sovereign Americans, Inc. is not seeking a distinct form of relief from the other Petitioners and therefore has standing.

69.    Petitioner Coalition of Concerned Voters of Ohio (*hereinafter* "CCVO") is a nonpartisan public interest group committed to ensuring that the election system in Ohio is secure, accurate, and trustworthy.

70.     CCVO has performed extensive research into the reliability of Dominion D-Suite Voting System machines (*hereinafter* "DVS machines"), which is summarized as follows:

      a. Over the past three (3) years, DVS machines used in Fulton County, Georgia and Mesa County, Colorado have been subject to forensic examination by independent teams of cybersecurity experts, culminating in the Halderman Report and the Mesa County Colorado Reports.

      b. Forensic examination revealed that the DVS machines are vulnerable to manipulation and therefore unsafe for use in any election due to significant security flaws.

      c. The cybersecurity experts who authored the Halderman Report and Mesa County Colorado Reports concluded that the DVS machines should not have been certified, despite previous certification by a federally accredited Voting System Test Laboratory.

      d. These cybersecurity experts further advised that the vendor cannot be relied upon to rectify the substantially flawed system riddled with vulnerabilities with a simple software patch.

71.     The DVS machines subject to examination in Georgia and Colorado are currently in use in twelve (12) counties within the state of Ohio, including Wood County and Wayne County.

72.     In written correspondence to each of the corresponding twelve (12) Boards of Elections, CCVO expressed concern that the DVS machines used in Ohio may have similar security flaws requiring decertification. A copy of the letter dispatched to the Wood County Board of Elections, dated December 28, 2023, is attached hereto as Exhibit "1."

73.    On January 29, 2024, CCVO received a response from the Wayne County Board of Elections stating that Secretary LaRose issued security requests to the vendor, which were addressed in a software patch to be implemented in 2024.

74.    CCVO expressed the same concerns in a letter dispatched to Secretary LaRose dated February 23, 2024, requesting that he appoint an independent team of cyber experts to review the Halderman and Mesa County reports and be given access to the DVS machines for examination to determine if security flaws exist. That letter is attached hereto as Exhibit "2."

75.    Petitioner James Rigano (*hereinafter* "Mr. Rigano") is a citizen of Warren County, Ohio who has sent over one-hundred written inquiries to the Office of the Ohio of Secretary of State and a majority of Ohio's individual boards of elections requesting transparency as to election law compliance and voter registration roll discrepancies. Documentation of Mr. Rigano's efforts to improve election integrity in Ohio is attached hereto as Exhibit "3."

76.    Petitioner Carrie Perkins (*hereinafter* "Ms. Perkins") is a citizen of Wayne County, Ohio who was a candidate for the Triway School Board in 2023. Ms. Perkins advanced personal and donated funds to support her campaign and relied upon state voter rolls.

77.    On election night, Ms. Perkins achieved victory by one (1) vote. The corresponding unofficial Election Summary Report is attached hereto as Exhibit "4."

78.    However, as gleaned from the official Election Summary Report, which is attached hereto and marked Exhibit "5," after absentee ballots were compiled, Ms. Perkins was defeated by four (4) votes.

79.    Petitioner Jacqueline Loughman (*hereinafter* "Ms. Loughman") is a citizen of Stark County, Ohio who has volunteered as a Stark County poll worker for elections since 2020.

80. In 2020, while Ms. Loughman was volunteering as a poll worker for the primary election, she and other poll workers were unable to conduct the end-of-the-night audit to reconcile the machine vote and the paper ballot totals on the e-pollbook at the voting location, as required by Ohio law.

81. When Ms. Loughman contacted the local board of elections to report the issue, officials there told her to submit the voting materials without completing the audit. This was the only correspondence between Ms. Loughman and the local board of elections regarding the subject.

82. Petitioner Joseph Healy (*hereinafter* "Mr. Healy") is a citizen of Franklin County, Ohio who voted in the 2022 Ohio General Election.

83. Petitioner Mary Ann Brej (*hereinafter* "Ms. Brej") is a citizen of Cuyahoga County, Ohio who voted in the 2022 Ohio General Election.

84. Thomas Wood (*hereinafter* "Mr. Wood"), of Wooster, Ohio, though not an individually named Petitioner herein but acting on behalf of United Sovereign Americans, Inc., submitted a complaint to Secretary LaRose, dated January 19, 2024 and attached hereto as Exhibit "6," requesting transparency as to Ohio's compliance with the Ohio Revised Code and an explanation for why "more than one million potential voter irregularity/registration cases" which were not classified as illegal votes during the Ohio 2022 General Election.[5]

85. In a written response dated January 26, 2024 and attached hereto as Exhibit "7," the Office of the Ohio Secretary of State shouldered blame to individual boards of elections, identified "human data entry errors" as the "core problem," and advised that "[t]he county-maintained voter registration list is the official list, and the copy we maintain at the Secretary of

---

[5] The exhibits referenced in Mr. Wood's complaint are attached hereto as Exhibits "8" and "9."

State's office and publish on our website is only a mirror." This statement, Petitioners aver, is in direct contradiction of Ohio law requiring the Secretary of State's Registration List to be the state's official list and not merely a mirror of the individual counties' lists. *See* R.C. § 3503.15(A).

86.     Petitioners have been and continue to be harmed by the state of Ohio's voting systems currently (and formerly) in use in Ohio state and federal elections. Respondents have allowed, and continue to allow, violations of federal election laws, Ohio election laws, the United States Constitution, and federal civil rights laws pertaining to voter rights.

87.     The violations of Ohio election laws, federal election laws, the U.S. Constitution, and federal civil rights laws pertaining to voter registration rolls, transparency, compliance, and certification of the voting systems, and the serious issues with the overall voting systems raised below, exemplify their injury.

88.     The injury to Petitioners and all Ohio voters would cease to exist or be greatly relieved if the Court grants Petitioners' requested relief.

89.     The Supreme Court has indicated that if one party to a lawsuit has standing, other entities can join as parties without having to independently satisfy the demands of Article III, provided those parties do not seek a distinct form of relief from the party with standing. *See, Horne v. Flores*, 557 U.S. 433, 446-47 (2009).

## V.     BACKGROUND

### A.     <u>The Constitutionally Protected Right to Vote</u>

90.     The United States Constitution grants the people the right to choose their representatives from the people of the several states, according to the voting eligibility requirements of that state. U.S. Const. art. I, § 2, as modified by Amendment XXVI.

91.     The 14th Amendment of the United States Constitution, Section 1, defines a "citizen" as all people born or naturalized in the United States and subject to the jurisdiction thereof.

92.     The 14th Amendment of the United States Constitution, Section 2, protects eligible citizen voters against denial or abridgment of their vote.

93.     "The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury." *Marbury v. Madison*, 1 Cranch 137, 5 U.S. 137, 163 (1803).

94.     Federal courts regard the right to vote in a fairly conducted election as a constitutionally protected feature of United States citizenship. *Reynolds v. Sims*, 377 U.S. 533, 554-55 (1964).

95.     After the 2020 Presidential Election, pervasive discussion reported on by the media focused on the validity of the presidential election results within the state of Ohio.

96.     Discussions and/or litigation in Ohio, as well as in other states around the nation, centered on whether raw vote totals were accurate, with particular attention focused on the question: if all ballots in dispute were decided, hypothetically, in the favor of one candidate for president over the other, would that have changed the *outcome* of the election in that state?

97.     Questions concerned whether the recorded vote totals, viewed in the light most favorable to the losing candidate in any given state, could have affected the awarding of electoral votes from said state, which, in turn, might have affected the determination of the "winner" of the elections for president and vice-president in the Electoral College.

98.     The media widely reported that no court ruled that, even if all disputed ballots were assumed to have been found to be favorable to the Republican candidate during the 2020

presidential election, the outcome in any disputed state would not have been affected. Furthermore, there was insufficient evidence produced such that a court could find that the outcome of the election in any disputed state was unreliable.

99.     Petitioners do not seek to revisit the results of the 2020 presidential election, nor to re-examine the conclusions drawn by the various courts and media outlets.

100.     Petitioners instead posit a different question: ***How many disputed ballots found to be improperly cast in any given federal election may occur before the reliability and integrity of the entire election becomes suspect?*** Petitioners respectfully represent that Congress has answered this very question as outlined further below, and Congress' answer to this question forms much of the basis of the instant Petition.

101.     In *In re: Coy*, 127 U.S. 731 (1888), the United States Supreme Court held that Congress had authority under the Constitution's Necessary and Proper Clause to regulate any activity during a mixed federal/state election that exposed the federal election to potential harm, whether that harm materialized or not. *Coy* is still good law. *See, United States v. Slone*, 411 F.3d 643, 647 (6th Cir. 2005); *United States v. Mason*, 673 F.2d 737, 739 (4th Cir. 1982); *United States v. Malmay*, 671 F.2d 869, 874–75 (5th Cir. 1982). *See also*, *Ex parte Yarborough*, 110 U.S. 651 (1884); *Ex parte Siebold*, 100 U.S. 371 (1880).

102.     In *Oregon v. Mitchell*, the Supreme Court stated:

> "The right to vote is, of course, different in one respect from the other rights in the economic, social, or political field which, as indicated in the Appendix to this opinion, are under the Equal Protection Clause. The right to vote is a civil right deeply embedded in the Constitution. Article I, § 2, provides that the House is

composed of members 'chosen . . . by the People' and the electors 'shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature.' The Seventeenth Amendment states that Senators shall be 'elected by the people.' The Fifteenth Amendment speaks of the 'right of citizens of the United States to vote' -- not only in federal but in state elections.

\* \* \*

[T]he right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government. This 'right to choose, secured by the Constitution,' *United States v. Classic*, 313 U.S. 299, is a civil right of the highest order. Voting concerns 'political' matters; but the right is not 'political' in the constitutional sense. Interference with it has given rise to a long and consistent line of decisions by the Court; and the claim has always been upheld as justiciable.

*Mitchell*, 400 U.S. 112, 138-39 (1970).

98. Justice Harlan also stated the following in his concurring opinion:

[A]s the right in the people of each State to a republican government and to choose their Representatives in Congress is of the guarantees of the Constitution, by this amendment a remedy might be given directly for a case supposed by *Madison*, where treason might

change a State government from a republican to a despotic government, and thereby deny suffrage to the people."

*Id.* at 185 (Harlan, J., concurring in part).

99.    The Supreme Court further stated: "we are cautioned about the dangers of entering into political thickets and mathematical quagmires. Our answer is this: a denial of constitutionally protected rights demands judicial protection; our oath and our office require no less of us." *Sims*, 377 U.S. at 566.

100.    "Every voter in a federal . . . election . . . whether he votes for a candidate with little chance of winning or for one with little chance of losing, has a right under the Constitution to have his vote fairly counted, *without its being distorted by fraudulently cast votes*." *Anderson v. United States,* 417 U.S. 211, 227 (1974) (emphasis added).

### B.    National Voter Registration Act

101.    NVRA was enacted for the purpose of ensuring accurate and current voter registration rolls to enhance the integrity of elections.

102.    In so doing, Congress found that: (1) the right of citizens of the United States to vote is a fundamental right; (2) it is the duty of the federal, state, and local governments to promote the exercise of that right; and (3) discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections for federal office and disproportionately harm voter participation by various groups, including racial minorities. 52 U.S.C. § 20501.

103.    NVRA exists in part to "protect the integrity of the electoral process" and "to ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501.

104.    NVRA *requires* states to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters" by reason of death or change of address. 52 U.S.C. § 20507(a)(4).

105.    Similarly, the EAC is required by law to report to Congress its findings related to state voter registration practices. 52 U.S.C. § 20508(a)(3).

106.    Federal regulations require states to provide data to the EAC for use in their reports, including the numbers of active voters, and the numbers of registered voters removed from the rolls for any reason. 11 C.F.R. § 9428.7(b)(1), (2), (5).

107.    NVRA requires individual states to complete any program the purpose of which is to remove ineligible voters from the official lists of eligible voters not later than ninety (90) days prior to an election.

108.    NVRA has two (2) methods of enforcement. First, the Attorney General can petition the court for declaratory and injunctive relief. Second, a private citizen can pursue a cause of action with certain requirements as follows. In a private action, notice is required, in that a person must notify the chief election official of the State involved. If the violation is not corrected within ninety (90) days of receipt of the notice or within twenty (20) days after receipt of the notice, if the violation occurred within 120 days before the date of an election for office, the aggrieved person may bring a civil action in an appropriate district court seeking relief. In the alternative, if the violation occurs thirty (30) days before the date of an election for federal office, no notice is required.

109.    Although NVRA authorizes a private cause of action in the form of declaratory or injunctive relief, this "remedy" is largely toothless. Any court in the United States would have

great reluctance to formally order election officials to correct NVRA error and/or decertify an election so close in time to an actual election or just after certification.

110.    Additionally, to what extent NVRA requires a hypothetical plaintiff to have suffered injury is not clear – standing could be a troublesome burden to prove particularly if the harm, such as voter fraud and dilution, has been committed on a class people, the electors as a whole, rather than against an individual person.

111.    Furthermore, a respondent could seek to use the doctrine of laches to convince a court to avoid the distasteful task of questioning election officials, inquiring into potentially fraudulent elections, and inaccurate voting rolls, despite a hypothetical plaintiff being in full compliance with the private NVRA notice requirements, a risk Petitioners now face as they seek to pursue their private cause of action under NVRA.

112.    Congress' power to pass NVRA comes from Article I, Section 8, Clause 18 of the United States Constitution, the Necessary and Proper Clause, making accurate voter rolls a requirement to uphold the right of the people to choose their representatives.

## C.    Help America Vote Act

113.    HAVA exists in part to "establish minimum election administration standards for States and units of local government with responsibility for the administration of Federal elections, and other purposes." H.R. 3295 (2002).

114.    HAVA requires that voter roll databases contain only the registrations of qualified citizen voters residing in that state. 52 U.S.C. § 21083(a).

115.    HAVA defines a voting system as "the total combination of mechanical, electromechanical, or electronic equipment (including software, firmware, and documentation required to program, control, and support the equipment) that is used to define ballots; to cast and

count votes; to report or display election results; and to maintain and produce any audit trail information." 52 U.S.C. § 21081(b).

116.    The purpose of any voting system is to accurately record, store, consolidate, and report the specific selections, and absence of selections, made by the voter as well as to accurately measure the intent of the total body of eligible voters that voted.

117.    Petitioners believe and therefore aver the ability to "cast and count votes" begins with establishing eligibility and registering only qualified citizens into voter registration databases, thus assuring that all ballots granted, cast, and counted, are lawful.

118.    Petitioners believe and therefore aver that inaccurate voter rolls have significant negative consequences in elections.

119.    Per HAVA, in any given state, each qualified voter is granted a unique statewide identifier in a database, designed to eliminate the risk of double-voting or extra ballots being cast in the name of one individual voter.

120.    HAVA furthermore requires that federal elections adhere to an accuracy standard established by the FEC through Section 3.2.1 of its Voting System Standards (2002), which states in relevant part that error rates are, "...*set at a sufficiently stringent level such that the likelihood of voting system errors affecting the outcome of an election is exceptionally remote even in the closest of elections.*"[6]

121.    Accuracy in a voting system is defined as the ability of the system to capture the intent of voters without error.[7]

---

[6] United States (2002) *U.S. Federal Election Commission FEC.*
United     States     [Web     Archive]     Retrieved     from     the     Election     Assistance     Commission,
https://www.eac.gov/sites/default/files/eac_assets/1/28/Voting_System_Standards_Volume_I.pdf (emphasis added).
[7] United States. (2002) *U.S. Federal Election Commission FEC.*
United     States     [Web     Archive]     Retrieved     from     the     Election     Assistance     Commission,
https://www.eac.gov/sites/default/files/eac_assets/1/28/Voting_System_Standards_Volume_I.pdf.

122.    Section 301 of HAVA regarding "Voting System Standards," states that the "error rate of [a] voting system in counting ballots (determined by taking into account only those errors which are attributable to the voting system and not attributable to an act of the voter) shall comply with the error rate standards established under section 3.2.1 of the voting systems standards issued by the Federal Election Commission." 52 U.S.C. § 21081(a)(5).

123.    Petitioners ask this Court to recall that the FEC voting systems standards of section 3.2.1 establish that "the system shall achieve a target error rate of no more than **one (1) in 10,000,000 ballot positions, with a maximum acceptable error rate in the test process of one in 500,000 ballot positions.**" *See, supra.* at 30 (emphasis added).

124.    The Voluntary Voting System Guidelines (*hereinafter* "VVSG"), Version 1.1, Section 4.1.1 – Accuracy Requirements state, in part, **"[a]ll systems shall achieve a report total error rate of no more than one in 125,000."** Furthermore, "[t]he benchmark of one in 125,000 is derived from the 'maximum acceptable error rate' used as the lower test benchmark in the 2005 Voluntary Voting System Guidelines Version 1.0. That benchmark was defined as a ballot position error rate of one in 500,000. The benchmark of one in 125,000 is expressed in terms of votes, however, it is consistent with the previous benchmark that the estimated ratio of votes to ballot positions is 1/4."[8][9]

125.    HAVA also requires that states who receive payments for the administration of elections must use the funds "in a manner consistent with each of the laws described in Section

---

[8] In the latest version of the VVSG, or VVSG 2.0, the EAC adopted the position that "the value of 10,000,000 ballot positions is taken from VVSG 1.0 [VVSG2005], however it is used here as the minimum number of ballot positions to test without error. *If a larger number of ballot positions is used, there still can be no error.*" (emphasis added).
[9] United States (2015) *U.S. Election Assistance Commission.* United States [Web Archive] Retrieved from the Election Assistance Commission, https://www.eac.gov/sites/default/files/eac_assets/1/28/VVSG.1.1.VOL.1.FINAL1.pdf.

21145 . . . and the proposed uses are not inconsistent with the requirements of Title III." 52 U.S.C. § 20971(c).

126.    Petitioners suggest that a private cause of action exists, and assert that right, under HAVA through 42 U.S.C. § 1983. *Colon-Marreror v. Velez*, 813 F.3d 1, 22 (1st Cir. 2016) (finding a private action under § 1983 for HAVA violations because the provision provided enforceable voting rights and imposes binding obligations on state officials).

127.    Section 1983 provides a mechanism for enforcing individual rights secured elsewhere as in rights independently secured by the Constitution and laws of the United States. *Gonzaga University v. Doe*, 536 U.S. 273, 284-85 (2002). Importantly, a § 1983 plaintiff must assert a violation of a federal right, not just a law. *Blessing v. Freestone*, 520 U.S. 329, 340 (1997).

128.    A private cause of action pursuant to § 1983 can be found for violations of HAVA, which requires voting systems to provide the voter with the opportunity to change the ballot or correct any apparent error before the ballot is cast and counted. 52 U.S.C § 21081(a)(1)(A)(ii). Faulty configuration of the voting machines by those government workers responsible could constitute such a violation.

129.    Section 1983 as here advanced by Petitioners is currently the only mechanism where HAVA violations will receive any meaningful private review, yet it has proven thus far to be ineffectual at providing any real remedy for HAVA violations.

130.    Like with NVRA, Congress' power to pass HAVA comes from Article I, Section 8, Clause 18 of the United States Constitution, the Necessary and Proper Clause, making accurate voting systems a requirement to uphold the right of the people to choose their representatives.

### D.     Ohio Election Code

131.     Under the Ohio Revised Code, the Secretary of State, as the chief election officer, oversees and regulates voter registration procedures and the conduct of elections throughout the state of Ohio. R.C. § 3501.04.

132.     Election duties of the Secretary of State are, *inter alia*, the following:

a.   Appointing all members of county boards of elections. R.C. § 3501.05(A).

b.   Instructing members of the boards as to the proper methods of conducting elections. R.C. § 3501.05(B).

c.   Preparing rules and instructions for the conduct of elections. R.C. § 3501.05(C).

d.   Compelling the observance by county election officers of the requirements of the election laws. R.C. § 3501.05(M).

e.   Investigating the administration of election laws, frauds, and irregularities in elections in any county, and report violations of election laws to the attorney general and/or local law enforcement officials for prosecution. R.C. § 3501.05(N)(1).

f.   Filing a complaint with the Ohio elections commission whenever the Secretary of State has or should have knowledge of a failure to comply with the election laws. R.C. § 3501.05(N)(2).

g.   Adopting rules for the removal by boards of elections of ineligible voters from the statewide voter registration database. R.C. § 3501.05(Q).

h.   Establishing and maintaining a computerized statewide database of all legally registered voters in compliance with HAVA and providing training in the operation of that system. R.C. § 3501.05(W).

      i.   Implementing procedures and standards for determining when a board of elections shall be placed under official oversight of the Secretary of State. R.C. § 3501.05(D)(D).

133.    The statewide voter registration database established and maintained by the Secretary of State, which is administered by the Office of Data Analytics and Archives in the Office of the Secretary of State, is the official list of registered electors for all elections conducted in Ohio. R.C. § 3503.15(A).

134.    At a minimum, the statewide voter registration database must include all of the following:

      a.   An electronic network connecting the Office of the Secretary of State with all board of elections offices and with the offices of all other boards of elections. R.C. § 3503.15(B)(1).

      b.   A computer program that harmonizes the records contained in the database with records maintained by each board of elections. R.C. § 3503.15(B)(2).

      c.   An interactive computer program that allows access to the records contained in the database by each board of elections and by any persons authorized by the Secretary of State to add, delete, modify, or print database records, and to conduct updates of the database. R.C. § 3503.15(B)(3).

      d.   A search program capable of verifying registered electors and their registration information. R.C. § 3503.15(B)(4).

      e.   Safeguards to ensure that the integrity, security, and confidentiality of the voter registration information is maintained. R.C. § 3503.15(B)(5).

135. As such, Ohio voters, such as Mr. Rigano, Ms. Perkins, Ms. Loughman, Mr. Healy, and Ms. Brej, should be able to reasonably rely upon the results produced by the statewide voter registration database as to whether their votes have been properly registered and counted.

136. The Secretary of State is required to implement regulations for application to the statewide voter registration database which address all of the following:

    a. Specifying the manner in which all voter registration records are maintained by boards of elections in other data formats shall be converted for inclusion in the statewide voter registration database. R.C. § 3503.15(E)(1).

    b. Establishing a uniform method for entering voter registration records maintained by boards of elections on an expedited basis and for transmitting information securely to the Secretary of State. R.C. § 3503.15(E)(2).

    c. Establishing a uniform method for purging canceled voter registration records from the statewide voter registration database. R.C. § 3503.15(E)(3).

    d. Specifying the persons authorized to add, delete, modify, or print records contained in the statewide voter registration database and to make updates of that database. R.C. § 3503.15(E)(4).

    e. Establishing a process for annually auditing the information contained in the statewide voter registration database. R.C. § 3503.15(E)(5).

137. In accordance with the foregoing, the Secretary of State, through the office of data analytics and archives, and in conjunction with the boards of elections, must maintain the accuracy of the statewide voter registration database. R.C. § 3503.151(A).

138.    In furtherance of the duty to ensure that the accuracy of the statewide voter registration is maintained, the Secretary of State is required to regularly furnish to the boards of elections all information and data necessary to do the following:

a.  Require the boards of elections to maintain the database in a manner that ensures that the name of each registered elector appears in the database, that only individuals who are not registered or eligible to vote are removed from the database, and that duplicate registrations are eliminated from the database. R.C. § 3503.151(D)(1).

b.  Require the boards of elections to make a reasonable effort to remove individuals who are not eligible to vote from the database. R.C. § 3503.151(D)(2).

c.  Establish safeguards to ensure that eligible electors are not removed in error from the database. R.C. § 3503.151(D)(3).

139.    The Secretary of State is required to establish a uniform method for addressing instances in which records contained in the statewide voter registration database do not conform with records maintained by an agency, state, or a group of states. R.C. § 3503.151(E)(1).

140.    The Secretary of State must also adopt rules directing that any updated voter registration information must be verified by the Secretary of State or a board of elections before the information is added to the statewide voter registration database for purposes of modifying an existing voter registration. R.C. § 3503.09(B)(2).

141.    Fourteen (14) days prior to an election, the boards of elections shall prepare from the statewide voter registration database "a complete and official registration list for each precinct, containing the names, addresses, and political party whose ballot the elector voted in the most

recent primary election within the current year and the immediately preceding two (2) calendar years, of all qualified registered voters in the precinct[.]" R.C. § 3503.23(A).

142. As Ohio's chief election officer, in addition to the duties outlined above, the Secretary of State is required to ensure proper certification of voting and tabulating equipment. In so doing, the Secretary of State must establish guidelines for the approval, certification, and continued certification of the voting machines, marking devices, tabulating equipment, and electronic pollbooks to be used in the Ohio election process. R.C. § 3506.05(H)(1).

143. No voting machine shall be certified by the Secretary of State unless it satisfies, *inter alia*, the following requirements, under which the voting machine shall:

    a. Permit each elector to vote for all persons and offices for whom and for which the elector is lawfully entitled to vote and to vote for as many persons for an office as the elector is entitled to vote for. R.C. § 3506.10(B).

    b. Preclude each elector from voting for any candidate for whom the elector is not entitled to vote, from voting for more persons for any office than the elector is entitled to vote for, and from voting for any candidates for the same office more than once. R.C. § 3506.10(C).

    c. Permit each elector, at all presidential elections, to vote for candidates of one party for president, vice president, and presidential electors. R.C. § 3506.10(F).

    d. Be capable of adjustment by election officers so as to permit each elector, at a primary election, to vote only for the candidates of the elector's affiliated party and shall preclude the elector from voting for any candidate seeking nomination by any other political party; and to vote for the candidates for nonpartisan nomination or election. R.C. § 3506.10(G).

e. Have a counter which will show at any time during the voting the total number of electors who have voted; and also, a protective counter, the register of which cannot be reset, which will record the cumulative total number of movements of the internal counters. R.C. § 3506.10(I).

f. Be fitted with locks and seals by the use of which, immediately after the polls are closed or the operation of the machine for an election is completed, no further changes to the internal counters can be allowed. R.C. § 3506.10(J).

g. Be so constructed that a voter may readily learn the method of operating it, may expeditiously cast a vote for all candidates of the voter's choice, and when operated properly shall register and record correctly and accurately every vote cast. R.C. § 3506.10(M).

h. Preclude any person from seeing or knowing the number of votes registered for any candidate and from tampering with any of the internal counters. R.C. § 3506.10(N).

i. Include a voter verified paper audit trail, if the voting machine is a direct recording electronic device. R.C. § 3506.10(P).

144. The board of elections, as instructed by the Secretary of State, shall adhere to both of the following requirements prior to any election before a voting machine, marking device, or piece of automatic tabulating equipment may be used pursuant to R.C. § 3506.14(D):

a. Test and audit the variable codes applicable to that election to verify the accuracy of any computer program that will be used for tallying the ballot cards for each precinct in which an election will be held. R.C. § 3506.14(A)(1).

b. Conduct systematic logic and accuracy testing of every component of every voting machine, marking device, or piece of automatic tabulating equipment with every

ballot style to be used in the election to ascertain that the ballots are accurate and that the machines, devices, and equipment will accurately record, mark, or count the votes cast for all offices. R.C. § 3506.14(A)(2).

145.    The Secretary of State must prescribe regulations to be followed by each board of elections regarding the examination, testing, and use of the voting machine and tabulating equipment and how votes shall be tallied and reported to the board, in addition to any other regulations the Secretary of State deems necessary to ensure the adequate care and custody of voting equipment, and the accurate registering, counting, and canvassing of the votes in any Ohio election. R.C. § 3506.15.

146.    The Ohio Revised Code prescribes numerous criminal penalties for failing to adhere to the election laws, including, *inter alia*, the following:

   a.  Bribery. R.C. § 3599.01.

   b.  Contributions for illegal election purposes. R.C. § 3599.04.

   c.  Unlawful possession or distribution of ballots. R.C. § 3599.07.

   d.  Influencing candidates and voters by publications. R.C. § 3599.08.

   e.  False voter registration. R.C. § 3599.11.

   f.  Illegal voting. R.C. § 3599.12.

   g.  Purchase, theft, sale, destruction, or mutilation of petitions. R.C. § 3599.15.

   h.  Interference with conduct of election. R.C. § 3599.24.

   i.  Inducing illegal voting. R.C. § 3599.25.

   j.  Tampering with ballots. R.C. § 3599.26.

   k.  Possession of or tampering with voting machine, automatic tabulating equipment, or marking device. R.C. § 3599.27.

l. False signatures. R.C. § 3599.28.

m. Possession of false records. R.C. § 3599.29.

n. Fraudulent marking or altering ballots or election records. R.C. § 3599.33.

o. Election falsification. R.C. § 3599.36.

147. Petitioners believe and therefore aver that Ohio cannot demonstrate effective control over voter eligibility in conformity with federal or state requirements, and Ohio has implemented a system that does not guarantee accuracy or compliance with legal mandates requiring Ohio election officials to ensure that only eligible voters may register and vote.

### E. Election Fraud Congress Sought to Guard Against

148. Petitioners do not accuse any person or entity of engaging in election fraud in 2022, nor propose any person or entity will engage in such fraud in 2024 or in any subsequent federal elections in Ohio. Petitioners' purpose in describing types of voter fraud is to set forth the harms Congress sought to avoid by implementation of HAVA and NVRA as well as the various statutes passed by the Ohio General Assembly as cited above.

149. Petitioners believe and therefore aver that election fraud can occur in multiple diverse ways, not all of which are individualized to a specific actor.

150. Petitioners believe and therefore aver over the past fifty (50) years, Congress has enacted criminal laws with broad jurisdictional basis to combat false voter registrations, vote-buying, multiple-voting, and fraudulent voting in elections in which a federal candidate is on the ballot. *See* 52 U.S.C. §§ 10307(c), 10307(e), and 20511.

151. The federal jurisdictional predicate underlying these statutes is satisfied as long as either the name of a federal candidate is on the ballot, or the fraud involves corruption of the voter registration process in a state where one registers to vote simultaneously for federal as well as

other offices. *Slone*, 411 F.3d at 647–48; *United States v. McCranie*, 169 F.3d 723, 727 (11ᵗʰ Cir. 1999).

152.    Voting in federal elections for individuals who do not personally participate in, and assent to, the voting act attributed to them, or impersonating voters, or casting ballots in the names of voters who do not vote in federal elections, can constitute prosecutable election fraud. *See* 52 U.S.C. §§ 10307(c); 10307(e); and 20511(2).

153.    It is *possible* for election officials acting "under color of law" to commit election fraud by performing acts such as diluting ballots with invalid ones (ballot stuffing), rendering false tabulations of votes, or preventing valid voter registrations or votes from being given effect in any election, federal or non-federal (18 U.S.C. §§ 241 and 242), as well as in elections in which federal candidates are on the ballot. *See* 52 U.S.C. §§ 10307(c), 10307(e), and 20511(2).[10]

154.    An individual commits election fraud by submitting fictitious names to election officers for inclusion on voter registration rolls, thereby qualifying the fictious name to vote in federal elections. 52 U.S.C. §§ 10307(c) and 20511(2).

155.    An individual commits election fraud by knowingly procuring eligibility to vote for federal office by people who are not entitled to vote under applicable state law and/or people who are not United States Citizens. 52 U.S.C. §§ 10307(c) and 20511(2); 18 U.S.C. § 1015(f).

156.    An individual who makes a false claim of United States Citizenship to register to vote commits election fraud. 18 U.S.C. §§ 1015(f) and 911.

---

[10] For purposes of the within Petition, Petitioners do not suggest any Ohio election officials engaged in election fraud. Rather, Petitioners' point out the *possibility* of improper conduct by election officials as a harm against which Congress and the General Assembly have sought to guard by enacting the various statutes cited here. A reason Congress, especially in HAVA, set forth standards that must be met before an election is considered reliable is to counter potential election fraud and to thus produce presumptively reliable election results.

157.     A person who provides false information concerning a person's name, address, or period of residence in a voting district to establish voting eligibility commits election fraud. 52 U.S.C. §§ 10307(c) and 20511(2).

158.     Fraud can occur where an individual causes the production of voter registrations that qualify alleged voters to vote for federal candidates, where that individual knows the registrations are materially defective under applicable state law. 52 U.S.C. § 20511(2)

159.     However, election fraud need not involve the participation of individual voters. Election fraud can occur where an individual or organization places fictious names on voter rolls (allowing for fraudulent ballots which can later be used to stuff the ballot box, *supra.*), casting fake ballots in the names of people who did not vote, obtaining and marking absentee ballots without the input of the voter involved, and falsifying vote tallies.

160.     When the federal government seeks to maintain the integrity of elections, it does so for specific federal interests *inter alia*: (1) the protection of the voting rights of racial, ethnic, or language minorities, a specific constitutional right; (2) the registration of voters to vote in federal elections; (3) the standardization and procurement of voting equipment purchased with federal funds; (4) the protection of the federal election process against corruption; (5) the protection of the voting process from corruption accomplished under color of law; and (6) the oversight of non-citizen and other voting by persons ineligible to vote under applicable state law. Richard C. Pilger, *Federal Prosecution of Election Offenses*, p. 30, 8th Edition (2017).

161.     Congress has enacted a litany of specific crimes that can be prosecuted under a general definition as "election fraud":

      a.     Conspiracy Against Rights: 18 U.S.C. § 241. *See United States v. Saylor*, 322 U.S. 385 (1944) (stuffing a ballot box with forged ballots); *United States v. Classic*, 313

U.S. 299 (1941) (preventing the official count of ballots in primary elections); *United States v. Townsley*, 843 F.2d 1070, 1073–75 (8ᵗʰ Cir. 1988) (destroying ballots); *United States v. Morado*, 454 F.2d 167, 171 (5ᵗʰ Cir. 1972) (casting absentee ballots in elderly or handicapped peoples' names); *Crolich v. United States*, 196 F.2d 879, 879 (5ᵗʰ Cir. 1952) (impersonating qualified voters); *United States v. Colvin*, 353 F.3d 569, 576 (7ᵗʰ Cir. 2003) (conspiracy need not be successful nor need there be an overt act).

b. Deprivation of Rights under Color of Law: 18 U.S.C. § 242. *See United States v. Price*, 383 U.S. 787 (1966) (acted jointly with state agents); *Williams v. United States*, 341 U.S. 97 (1951) (actions clothed under Color of State Law).

c. False Information in, and Payments for, Registering and Voting: 52 U.S.C. § 10307(c).[11]

d. Voting More than Once: 52 U.S.C. § 10307(e).

e. Fraudulent Registration or Voting: 52 U.S.C. § 20511(2).

f. False claims to Register or Vote: 18 U.S.C. § 1015(f).

g. "Cost-of-Election" theory: 18 U.S.C. § 1341.

h. Improper Retention of Federal Election Returns: 52 U.S.C. § 20701.

162. In short, election fraud can constitute numerous different actions or inactions, and federal and state governments of the United States have an interest in guarding the integrity of elections, and ensuring election fraud is stopped, then prosecuted appropriately.

---

[11] "Section 10307(c) protects two distinct aspects of a federal election: the actual results of the election, and the integrity of the process of electing federal officials." *United States v. Cole*, 41 F.3d 303, 307 (7ᵗʰ Cir. 1994).

## VI.    FACTS AND SUMMARY OF THE ISSUES

163.    Petitioner United Sovereign Americans, Inc. reviewed Ohio's voter registration data from the 2022 General Election, which contained millions of entries of voter registration data.

164.    Thereafter, expert data analysts acting on behalf of Petitioner United Sovereign Americans, Inc. performed a series of SQL database queries on the data to extrapolate and refine information about voter registrations in the state of Ohio. *See* Exhibit "8" for a copy of the SQL Database Queries.

165.    United Sovereign Americans' SQL database queries revealed more than one (1) million voter registration apparent errors in the state of Ohio. *See Infra.*

166.    The results from the SQL database queries allowed Petitioners' experts to produce a "Scorecard" reflecting Ohio's voter registration data detailing the more than one (1) million apparent errors contained within that registration data. *See* Exhibit "9" for a copy of United Sovereign Americans' Ohio 2022 General Election Validity Scorecard.

167.    In addition, the results from the SQL Database Queries of Ohio's voter registration data allowed Petitioners' experts to compile a General Election Validity Reconciliation. *See* Exhibit "10" for a copy of United Sovereign Americans' Ohio 2022 General Election Validity Reconciliation.

168.    The results from the SQL Database Queries of Ohio's voter registration data also revealed that apparent errors were *not uniformly* distributed by population across Ohio's counties; some counties had far more registration apparent errors relative to population than others. *See* Exhibit "11" for a copy of United Sovereign Americans' Ohio 2022 General Election county-by-county breakdown.

169.    According to the data provided to Petitioner United Sovereign Americans, Inc. for the 2022 election, Ohio had 8,061,790 voter registrations one (1) day after certification.

A. **Voter Registration Roll Inaccuracy**

170.    Expert analysis by Petitioner United Sovereign Americans, Inc. of the official Ohio State Voter Registration Data for the 2022 election revealed that, out of the 8,061,790 voter registrations, there was a total of **1,203,438** voter registration violations including:[12]

    a.    34,233 illegal duplicates, where the same voter has multiple registrations.

    b.    158,209 incomplete or unknown addresses.

    c.    59,025 registrations on or before the registrant's date of birth.

    d.    4,143 age discrepant registrants, where the voter is over the age of 115 years or registered prior to attaining the age of eighteen (18) years.

    e.    253,486 registrations on New Year's Day.

    f.    84,221 registrations on a federal holiday (not including New Year's Day).

    g.    201,693 registrations on Sunday.

    h.    6,348 registrants with modified dates of birth.

    i.    38,403 registrants whose voter history inexplicably changed.

    j.    120,094 registrants with registration dates altered backwards, where the new registration date pre-dates record in earlier voter roll.

    k.    243,583 registrants with an altered "unique" state voter identification number.

171.    As demonstrated by the county-by-county breakdown, the above potential voter *registration violations* were pronounced in Ohio's largest counties. By way of example, in the 2022 General Election, 253,486 people statewide were registered to vote on a January 1st. Of those people statewide who registered on a January 1st, 189,276 of them were registered in Franklin County – nearly seventy-five percent (75%) of the statewide total from that single county.[13]

---

[12] *See* Exhibit 9.
[13] *See* Exhibit 11.

172.    Out of those 189,276 voters registered to vote on January 1st between the years of 1901 and 2022, 144,994 of those people voted. Dividing 144,994 votes by 189,276 voters, we discover that seventy-six-point-six percent (76.6%) of all voters registered to vote on January 1st in Franklin County voted in the 2022 General Election.

173.    Franklin County has 698,227 voters with registration dates on the remaining 364 days of the year. These voters cast 286,072 votes in the 2022 General Election. Dividing 286,072 votes by 698,227 voters, we discover that forty-one percent (41%) of all voters registered to vote on any day other than January 1st voted.

174.    This significant difference in turnout based solely on registration date, in the absence of clear certainty about the cause of this anomaly, may have unequally affected Franklin County voters in their choice of local representatives. Results in Franklin County may have also unequally affected Ohio voters in their choice of statewide and federal representatives.

175.    **Of all the votes cast in Franklin County in the 2022 General Election, one (1) out of every three (3) votes came from a person who registered on a January 1st sometime between 1901 and 2022.**

176.    All of the above Franklin County voting data, Petitioners' experts will establish as accurate at trial on the merits.

177.    Petitioners believe and therefore aver that using Franklin County as an example, the central Ohio registration database is flawed as Franklin County does not claim seventy-five percent (75%) of Ohio's population but *does* possess seventy-five percent (75%) of the January 1st registrations, meaning that the "January 1st Registration" anomaly is not evenly distributed throughout Ohio, suggesting a violation of the 14th Amendment's guarantee of equal protection if

Franklin County voters' votes in 2022 were diluted by persons voting who should not have been voting.

**B.    Votes from Ineligible Voters**

178.    Expert analysis on behalf of Petitioner United Sovereign Americans, Inc. of the official Ohio State Voter Registration Data for the 2022 election revealed that, out of the votes cast in the 2022 General Election, there were a total of **713,296** apparent voting violations and **602,631** *unique* votes impacted by apparent voting violations.[14] These violations were in the form of:[15]

a.    8,025 illegal duplicate registrations.

b.    41,126 incomplete or unknown addresses.

c.    48,957 registrations on or before the registrant's date of birth.

d.    49,362 registrations after the 2022 General Election cutoff date yet the registrant voted in the 2022 General Election.

e.    1,636 age discrepant registrants, where the voter is over the age of 115 years or registered prior to attaining the age of eighteen (18) years.

f.    197,757 registrations on New Year's Day.

g.    45,542 registrations on a Federal Holiday (not including New Year's Day).

h.    116,855 registrations on Sunday.

i.    3,456 registrants with modified dates of birth.

j.    18,210 registrants whose voter history inexplicably changed.

k.    63,513 registrants with registration dates altered backwards, where the new registration date pre-dates record in earlier voter roll.

---

[14] Some registered voters have more than one violation. The number of unique voters indicates how many individual registrations have apparent errors, whether it be one or multiple apparent errors.
[15] *See* Exhibit 9.

   l. 118,857 registrants with altered "unique" state voter identification number.

  179. Similarly to the voter registration violations, the above *voting violations* were particularly prominent in Ohio's most populous counties, with Franklin County accounting for **seventy-three percent (73%)** of voters with January 1st registration dates.[16]

  180. In sum, of the state's eighty-eight (88) counties, Ohio's five (5) most populous – Franklin, Cuyahoga, Hamilton, Summit, and Montgomery – encompassed **fifty-two percent (52%)** of all voter registration violations and **fifty-seven percent (57%)** of all voting violations, thereby disproportionately impacting voters such as Mr. Healy and Ms. Brej, who are residents of Franklin County and Cuyahoga County, respectively.[17]

  181. Petitioners believe and therefore aver this data shows that in 2022 the voter rolls in Ohio were not accurate and current as required by the NVRA, HAVA, and Ohio-specific laws pertaining to voter registration. 52 U.S.C. §§ 20501(b)(4) and 21081; R.C. § 3503.15.

  182. Thus far, Petitioners have exhausted every remedy known to them in advance of the 2024 (and subsequent) general election(s) to have these issues, and other issues raised below, addressed and remedied. Petitioners repeatedly sought in 2024 to seek redress and repair for these egregious violations through democratic means.

  183. Respondents have cavalierly dismissed, and continue to dismiss, Petitioners' concerns and, upon information and belief, have done so without any meaningful review, action, or response.

  184. Petitioners believe and therefore aver that Respondents intend to administer and ultimately certify Ohio's 2024 (and subsequent federal) general election(s) (involving both state and federal contests) using the same inaccurate and flawed data conditions.

---

[16] *See* Exhibit 11.
[17] *See* Exhibit 11.

**C.**     <u>Errors Rates in 2022 Compared to Rates Permitted Under Federal Law</u>

185.     Ohio's voting systems are subject to the permissible error rates set forth by Congress in HAVA and further elucidated by the FEC Voting System Standards 3.2.1 and explained in the EAC's VVSG. *Supra.*

186.     The *maximum* number of apparent voting system errors permissible in counting votes in the 2022 Ohio General Election using the calculations set forth by the FEC upon mandate by Congress was thirty-four (34) errors at most allowed. *The total number of ballots impacted by voting system errors in the 2022 Ohio General Election, however, was 602,631 apparent errors. See* Exhibit "9."

187.     Even accounting for the possibility that of the 602,631 apparent voting violations, many were not true errors, Petitioners believe and therefore aver that the state of Ohio cannot demonstrate that the 2022 General Election had thirty-four (34) errors or less starting from a "pool" of 602,631 potential errors.

188.     Under HAVA, an error rate of no more than one in 125,000 is permissible before the results of an *entire election* becomes suspect, and the integrity and reliability of the election itself compromised. As mentioned above, this figure is calculated by dividing the total number of Ohio ballots cast in a given election by 125,000 to arrive at the number of permissible errors in that election in order to create an error rate of no more than one in 125,000 mandated by the VVSG.

189.     For the 2022 Ohio General Election this is 4,201,368 (ballots counted) divided by 125,000, which equates to thirty-four (34) (rounded up) as the maximum errors permitted, meaning that in order for the election to be considered valid, there cannot have been more than thirty-four (34) voting system errors in the entire ballot tabulation for all ballots cast in that election.

190.     However, in the 2022 Ohio General Election, the number of voting system apparent errors in counting ballots was 602,631, a figure dramatically exceeding the maximum allowable apparent error rate of thirty-four (34).

191.     Because the voting system apparent error rate for the 2022 Ohio General Election was far above the maximum allowable error rates, Petitioners believe and therefore aver that the reliability and credibility of the 2022 results are cast into doubt as a matter of law.

192.     Petitioners believe and therefore aver that, without this Court ordering Respondents to engage in immediate widespread and thorough corrective measures, the error rate in all subsequent federal elections will continue to exceed the permissible and congressionally mandated error rates, rendering such elections not only unreliable, but *uncertifiable*.

## VII.     VOTER-TO-VOTE DEFICIT

193.     The official canvas for the 2022 Ohio General Election was 4,201,368 ballots counted, yet Ohio's official data astonishingly shows there were only 3,039,289 *voters who actually voted*, a discrepancy which can best be defined as a Voter-to-Vote deficit. *See* Exhibit 10.

194.     While local boards of elections are afforded thirty (30) days after the close of canvass, which was November 29, 2022, to update voter histories in the statewide voter roll database, Secretary LaRose certified the Ohio 2022 Ohio General Election as accurate on December 9, 2022, *prior to reconciliation of all official records*.

195.     At the conclusion of this thirty (30)-day reconciliation period, December 31, 2022, there remained a Voter-to-Vote deficit of 3,081 votes.

196.     Ohio election authorities cannot account for or explain these discrepancies of 1,162,079 votes at the time of certification, and 3,081 votes at the time of reconciliation, numbers far in excess of thirty-four (34), each of which indisputably constituted an "error."

197.     Petitioners believe and therefore aver that the **1,162,079 more votes counted than voters who voted** means that either tabulators overcounted votes statewide to a massive and impossible to believe degree, or there is an alternative source of the data discrepancy.[18]

198.     As further evidence exemplifying the significance of the Voter-to-Vote deficit, **21,759** unique electors were *added* to the statewide voter roll database between December 10, 2022, *one day after certification*, and December 31, 2022, the close of reconciliation. Of those electors, **1,658** voted in the 2022 Ohio General Election.

199.     Conversely, **40,280** unique electors were *removed* from the statewide voter roll database between December 10, 2022 and December 31, 2022, of which **2,859** voted in the 2022 Ohio General Election.

200.     Petitioners believe and therefore aver that certification of the 2022 Ohio General Election prior to reconciliation of voter histories in the statewide voter roll database contradicted Ohio law, rendered the accuracy of the election results suspect, and delegitimized the standing audit procedures designed to ensure the integrity of Ohio's combined state and federal elections.

A.     **Ohio's 2022 General Election Validity**

201.     During Ohio's 2022 General Election, out of the 8,061,790 total registrations, of which Petitioners believe and therefore aver, there were 7,015,359 *valid* registrations, 115,257 uncertain/illogical/invalid registrations, and 931,174 ineligible registrations in violation of black letter election laws. *See* Exhibit 10.

---

[18] Petitioners accuse no one of engaging in fraud or deceit. Petitioners merely point out the discrepancy, which could be due to unintentional tabulator error, fraud of unknown origin, a combination of both, or even fraud by the tabulators themselves. The discrepancy occurred in 2022 for an unknown reason. It is the deficit *itself*, regardless of the cause, that demonstrates an error rate far in excess of that permitted by HAVA calling into question the integrity of the election. Petitioners propose to ask this Court to order Respondents to ascertain why the deficit occurred in 2022, ensure that a similar deficit does not re-occur in 2024, and in all federal elections thereafter into the future.

202.    Petitioners believe and therefore aver that of the people holding the 7,015,359 valid registrations, 3,596,861 ballots were counted in the 2022 Ohio General Election.

203.    Petitioners believe and therefore aver that of the identified 115,257 uncertain/illogical/invalid registrations, 61,171 votes were counted in the 2022 Ohio General Election.

204.    Petitioners believe and therefore aver that of the 931,174 registrations that violated election laws, **541,460** of those people holding such suspect registrations actually *cast votes that were counted* in the 2022 Ohio General Election without any effort by Ohio to ascertain whether these people with suspect registrations were permitted to vote or not.

205.    Petitioners believe and therefore aver that the *registration* error rate in Ohio for the 2022 General Election was **twelve percent (12%)** of the total registrations on Ohio's voter rolls. This figure is arrived at by taking 115,257 uncertain/illogical/invalid registrations, plus 931,174 registrations which violated election laws, as a percentage of 8,061,790 total registrations.

206.    Petitioners believe and therefore aver that the *voter* system error rate in Ohio for the 2022 General Election was **fourteen percent (14%)**, arrived at by taking 61,171 votes counted from uncertain/illogical/invalid registrations, plus 541,460 votes counted from illegal registrations, as a percentage of 4,201,368 votes cast.

207.    To illustrate the significance of the voter system error rate, in 2022 the margin of victory in Ohio's 13th Congressional District was five percent (5%), with 149,816 votes to the "winner" and 134,593 votes to the "loser." The apparent error rate statewide in the 2022 Ohio General Election, fourteen percent (14%), when applied to the election in Ohio's 13th Congressional District, exceeds the margin of victory, meaning that if the apparent error rate in Ohio were evenly distributed by congressional district (which *ordinarily might* be a reasonable

assumption given that such districts must contain roughly the same number of people under the Constitution), the election results in Ohio's 13th Congressional District would be considered unreliable.[19] That is not to say that the eventual "winner" there did not receive more votes than the eventual "loser." It simply means if the apparent error rate is assumed to be evenly distributed throughout Ohio, the winner in the 13th Congressional District cannot be *confident* in his/her election, and the loser cannot be *confident* in his/her defeat *because the election itself* would not have produced results that are reliable by law, thereby calling the integrity of the entire election process into question.

208.    To expand on the above, Ohio's 2022 voter system error rate of fourteen percent (14%) *exceeded* the margin of victory in five (5) of Ohio's fifteen (15) congressional districts: 1, 7, 9, 13, and 15.  Thus, one-third (1/3) of Ohio's *current* members of the United States House of Representatives *might* hold their seats owing to legally unreliable election results.

209.    *Per* HAVA and the FEC, the legal standard of allowable registration errors for a federal election is 0.0008% (or one (1) out of 125,000) yet the voter system error rate in Ohio's 2022 combined state and federal General Election was fourteen percent (14%).

## VIII.    REQUESTED RELIEF

### A.    <u>All Writs Act – 28 U.S.C. § 1651</u>

210.    Petitioners are not seeking to undermine official elections results previously certified.  Petitioners have cited issues in prior Ohio federal elections to add weight to Petitioners'

---

[19] This is merely a simplified example for illustrative purposes as Petitioners are aware that the apparent error rates are *not* evenly distributed county-by-county and thus cannot be evenly distributed by congressional district.  For a county-by-county breakdown from highest to lowest apparent error rate by total numbers please see Exhibit 11 demonstrating which Ohio counties account for the greatest number of errors by total number.

belief that absent intervention by this Court, Respondents will permit the same apparent errors to occur in Ohio's 2024 General Election, and in all subsequent federal elections.

211.   Petitioners seek redress from the constitutional harm brought upon them, and the Ohio electorate at large, by Respondents failure to comply with federal and state election law.

212.   Petitioners believe and therefore aver that Respondents have done nothing, or an inadequate job, at addressing the issues presented in this Petition, particularly to address the inaccurate and apparently fraudulent voter rolls and voter systems used in federal elections conducted by state authorities.

213.   Respondents' inaction and/or failure to act compels Petitioners to ask that this Court issue a Writ of *Mandamus* requiring Respondents to comply with the two federal statutes at issue (HAVA and NVRA) along with Title 35 of the Ohio Revised Code, while giving Respondents a reasonable time within which to bring Ohio into compliance in time for the 2024 General Election and all federal elections conducted by the state of Ohio going forward while providing relief to 2024 voters if bringing Ohio into compliance in time is impossible upon showing by Respondents.

214.   Specifically, Petitioners respectfully seek that the Court order Respondents take steps, both short term and long term, to ensure the apparent errors made during the 2022 elections do not recur and to bring the State of Ohio into compliance with HAVA's specific mandate of no greater than one (1) voting error out of 125,000 votes.

215.   This Court is authorized to issue a writ of *mandamus* under "The All Writs Act," granting the power to United States federal courts to "issue all writs necessary or appropriate in the aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651.

216.     A writ of *mandamus* under 28 U.S.C. § 1651 is typically used to fill gaps in the law, and the Supreme Court of the United States has stated that The All Writs Act is a "legislatively approved source of procedural instruments designed to achieve 'the rational ends of the law.'" *Harris v. Nelson*, 394 U.S. 286 (1969) (All Writs Act *mandamus* properly used to conduct factual inquiries).

217.     A writ of *mandamus* is warranted where "(1) no other adequate means exist to attain the relief, (2) the party's right to issuance of the writ is clear and indisputable, and (3) the writ is appropriate under the circumstances." *Hollingsworth v. Perry*, 558 U.S. 183, 190 (2010) *quoting Cheney v. United States Dist. Ct.*, 542 U.S. 367, 380–81 (2004) (stay granted where district court likely did not follow federal law).

218.     A writ of *mandamus* is appropriate and necessary to vindicate the rights of citizens when a governmental agency or official has refused to perform a ministerial duty that Petitioners have established they have a clear legal right to have any governmental agency or official perform, in this case, requiring that Respondents, perform.

219.     A federal court may use all auxiliary writs as aids when it is "calculated in [the court's] sound judgment to achieve the ends of justice entrusted to it." *Adams v. United States*, 317 U.S. 269, 273 (1942) (writ of *habeas corpus* is available to the circuit courts of appeals).

220.     A "ministerial action" is a duty in a particular situation so plainly prescribed as to be free from doubt and equivalent to a positive command. *Wilbur v. United States*, 281 U.S. 206, 218 (1930); *see also Will v. United States*, 389 U.S. 90 (1967).

221.     "Mandamus is employed to compel the performance, when refused, of a ministerial duty . . . [i]t also is employed to compel action, when refused, in matters involving judgment and discretion, but not to direct the exercise of judgment or discretion in a particular way nor to direct

the retraction or reversal of action already taken in the exercise of either." *Wilbur*, 281 U.S. at 218. *See also*, *Decatur v. Paulding*, 39 U.S. 497, 514-17 (1840) (Secretary of the Navy's duty to approve of pensions was discretionary, and therefore, not ministerial); *Kendall v. United States*, 37 U.S. 524 (1838) (Postmaster General had a ministerial duty to make entries); *Work v. Rives*, 267 U.S. 175, 177 (1925).

222.    Instantly, Petitioners have tried everything to convince Respondents to do their jobs, leaving Petitioners no other remedy than to seek a writ of *mandamus*.

223.    Petitioners argue that injunctive and/or declaratory relief is inapplicable or inappropriate in this issue because the harm from the 2024 election is not yet realized and Petitioners are seeking to have Ohio election officials and/or federal officials bring the state of Ohio into compliance with federal and state law, specifically HAVA, NVRA, and Title 35 of the Ohio Revised Code, absent any other specific existing private cause of action Petitioners could assert that affords Petitioners relief.

224.    Petitioners believe and therefore aver Respondents have allowed, and continue to allow, violations of federal election laws, Ohio election laws, the United States Constitution, and federal civil rights laws pertaining to voter rights, which include mandating accurate registration rolls, transparency, compliance, and proper certification of the voting systems. 52 U.S.C. §§ 20501 and 21083.

225.    Petitioners believe and therefore aver that the voter rolls within the state of Ohio are inaccurate, in violation of NVRA and HAVA. These are not list maintenance failures. The inaccuracies represent a failure to control the process of validating and registering only qualified citizen voters. These apparently invalid and/or illegal registrations voted in large numbers in Ohio's 2022 General Election.

226.    Petitioners believe and therefore aver the Respondents have lost control of voter registration, leading to the distribution of ballots to what appear to be false registrants which results in a diluted vote and further harm to Petitioners and the electorate at large. The voter-to-vote deficit is illustrative here in that the official canvas for the 2022 Ohio General Election was 4,201,368 votes yet there exist 3,039,289 total votes in the data – a discrepancy of 1,162,079 votes. Upholding HAVA includes the risk assessments and proper certification of all system elements individually, and as a system as a whole.

227.    Petitioners believe and therefore aver an election official's job is fidelity to the law in administering the electoral process, thereby protecting the integrity of an election, and the citizens from corruption in the election process.

228.    Petitioners believe and therefore aver that Ohio officials' failure to follow the law has resulted in election outcomes that are untrustworthy. The voting system in its present form cannot be used to produce trustworthy reliable results without the requested judicial intervention.

229.    Petitioners believe and therefore aver a writ of *mandamus* is appropriate in this case. Respondents have failed, and continue to fail, in complying with federal and state laws regarding voting – including voting accuracy and accountability. It is clear from Respondents' conduct before, during, and after, the 2022 elections that, absent judicial action, Respondents will do nothing to repair the deficiencies noted above to ensure the integrity of Ohio elections are conducted in compliance with federal and state law.

230.    The scope of Petitioners' *mandamus* request is narrow: Petitioners seek this Court to order Respondents to follow existing federal and state law designed by Congress and the Ohio General Assembly to ensure that Ohio's 2024 and subsequent combined federal and state general elections produce reliable results within the margin of error rate allowed by law.

231.    Petitioners hold up the mathematically unreliable (according to, *inter alia*, HAVA) 2022 Ohio combined federal and state General Election as evidence that, should the writ not issue, the apparent error rate in the 2024 and subsequent combined general elections will continue to exceed the maximum error rate permitted before an election is unreliable.

232.    Petitioners seek that the requested writ direct Respondents to investigate and remedy the issues exposed in the 2022 elections to avoid repeating the same mistakes in future combined federal and state general elections which are constitutionally administered by Ohio pursuant to Article I, Section 4 (delegating to the state legislatures the power to regulate federal elections for members of the House of Representatives, with Congress reserving the power to "...alter such Regulations [made by the various state legislatures]..."),[20] and, generally, Article II, Section 1 (granting state legislatures the power to determine how presidential electors are chosen) of the United States Constitution.[21]

233.    Petitioners believe and therefore aver that since the Constitution reserves to Congress the *ultimate* (as opposed to the *presumptive*) power to regulate the means by which Congress' own members are chosen, while the Constitution simultaneously delegates the *presumptive* power to regulate such elections to, in this case, the General Assembly of the state of Ohio to further delegate as it sees fit to do so by law, those Respondents who are not federal officers

---

[20] Petitioners aver that NVRA and HAVA are examples of Congress' exercising its power under Article I, Section 4 to "alter" Ohio's (and all other states') otherwise absolute constitutional authority to regulate federal elections to the House of Representatives and, by application of the 17th Amendment to the U.S. Constitution providing for the direct election of two (2) senators from each state, Congress may exercise its authority "...from time to time by Law make or alter such Regulations..." [of the various states...] to regulate the election of United States Senators as well the election of members of the House of Representatives.

[21] Petitioners include citation to Article II and the choosing of electors for president and vice-president, (later modified by the 12th Amendment), to again demonstrate the Framers' intent that the various states shall have presumptive authority to regulate and administer the election of all federal officers on the ballot for consideration in a federal election. Article 1, Section 4 (as later amended) and Article II, Section (as later amended) are examples of where the Framers intentionally intertwined the powers of the various states with those of Congress, while making certain Congress maintained the *ultimate* power to regulate the election of its members, the then-prevailing concepts of *Federalism* and *Dual Sovereignty* notwithstanding.

*per se*, become federal officers by agency requiring them to carry out not only Ohio election law, but additionally to carry out federal election statutes passed by Congress and duly signed into law by the President under Congress' ultimate authority laid out in Article I, Section 4.

234.    Petitioners believe and therefore aver that delegations of authority by the General Assembly of powers to supervise federal elections to any Respondent Ohio officials pursuant to the General Assembly's power to regulate federal elections granted by Article I, Section 4, makes said Ohio Respondents into federal officers by agency or quasi-federal officials in the conducting of their duties to regulate federal elections.

235.    Petitioners believe and therefore aver that ordinary principles of federalism and dual sovereignty where a federal judge would be reluctant to issue an order to an Ohio official pertaining to how that state official may perform his/her official functions are inapplicable because the Respondent Ohio official is acting in his/her hybrid role as a quasi-federal officer as required by Article I, Section 4.

236.    Petitioners believe and therefore aver, then, that this Court has authority to issue the requested writ of *mandamus* to compel, not just the Respondent federal officers to ensure that federal election law is carried out in Ohio's 2024 and subsequent general elections, this Court also has the authority to compel Respondent Ohio officials because said officials are charged by the U.S. Constitution in the carrying out of federal law where Congress has asserted its power to "alter" existing Ohio federal election procedures as it did in enacting NVRA and HAVA.

237.    Petitioners believe and therefore aver that any delegation from the Ohio General Assembly to the executive branch of Ohio government (e.g., to the governor who may, in turn, delegate power to the secretary of state if needed, or any delegation of the General Assembly's power to regulate federal elections to the attorney general) still falls under this Court's authority

which is derived through Article I, Section 4's grant to the various state legislatures of the power to supervise federal elections.

238.    Petitioners believe and therefore aver that simply because the General Assembly may have chosen to delegate some of its authority to supervise federal elections to Respondent members of Ohio's executive branch of government, such delegation does not insulate such officials from the power of this Court, since this Court's power comes from its authority over the delegating entity, in this case the Ohio General Assembly.

**B.      Action to Compel Officers of the United States to Perform Their Official Duties – 28 U.S.C. § 1361**

239.    Petitioners hereby incorporate the averments contained in the foregoing Paragraphs as if more fully set forth herein.

240.    District courts are empowered with the ability to compel an officer or employee of the United States or any agency thereof to perform a duty owed to a plaintiff. 28 U.S.C. § 1361.

241.    Respondent Attorney General Garland, in his Official Capacity as Attorney General of the United States, is responsible for the enforcement of federal election laws, specifically HAVA and NVRA.

242.    Respondent Attorney General Garland is an officer of the United States.

243.    Petitioners believe and therefore aver that Respondent Attorney General Garland has done nothing, or, at best, an inadequate job at addressing the issues presented above, namely, the inaccurate and apparently fraudulent voter rolls and systems within Ohio.

244.    The inaction and/or failure to act is harming Petitioners and the Ohio electorate at large warranting issuance of a Writ of *Mandamus* compelling Respondent Attorney General Garland to enforce and police the two (2) federal statutes at issue (NVRA and HAVA) for implementation in the Ohio 2024 General Election and subsequent combined federal and state

elections administered by Ohio officials, and giving Respondents a reasonable period of time in which to do so.

245.    Specifically, the Court should order Respondents to take preventative measures to see the apparent errors evident in the 2022 elections are not repeated in the 2024 and subsequent elections and bring the state of Ohio into compliance with HAVA's specific mandate of no greater than one (1) voting error out of 125,000 votes to ensure reliable election results as HAVA intended.

246.    A writ of *mandamus* is warranted where "(1) no other adequate means exist to attain the relief, (2) the party's right to issuance of the writ is clear and indisputable, and (3) the writ is appropriate under the circumstances." *Perry*, 558 U.S. at 190 *quoting Cheney*, 542 U.S. at 380–81 (stay granted where district court likely did not follow federal law).

247.    A writ of *mandamus* is appropriate and necessary to vindicate the rights of citizens when a governmental agency or official has refused to perform a ministerial duty that the petitioner has established has a clear legal right to have the governmental agency or official, in this case Respondents, perform.

248.    A "ministerial action" is a duty in a particular situation so plainly prescribed as to be free from doubt and equivalent to a positive command. *Wilbur*, 281 U.S. at 218.

249.    Relief contemplated under statute providing that federal district courts shall have original jurisdiction of any action in nature of *mandamus* to compel an officer or employee of United States or any agency thereof to perform a duty owed to plaintiff is at least as broad as under common-law writ of *mandamus. Carey v. Local Bd. No. 2, Hartford, Conn.*, 297 F.Supp. 252 (D. Conn. 1969), aff'd, 412 F.2d 71 (2nd Cir. 1969).

250. Petitioners believe and therefore aver they have no other remedy than a writ of *mandamus* and to compel an officer or employee of the United States or any agency thereof to perform a duty owed to plaintiff/petitioner.

251. Petitioners argue that injunctive and/or declaratory relief is inapplicable or inappropriate to this issue because the harm from the 2024 election is not yet realized and Petitioners are seeking to have Ohio election officials and/or federal officials bring the state of Ohio into compliance with federal and state law, specifically HAVA, NVRA, and the Title 35 of the Ohio Revised Code, absent any other specific private cause of action that affords Petitioners relief.

252. Petitioners believe and therefore aver that Respondent Attorney General Garland has allowed, and continues to allow, violations of federal election laws, the United States Constitution, and federal civil rights laws pertaining to voter rights, which include mandating accurate registration rolls, transparency, compliance, and proper certification of the voting systems.

253. Petitioners believe and therefore aver the voter rolls within the state of Ohio are inaccurate, in violation of NVRA and HAVA. These are not simply list-maintenance failures. Instead, the inaccuracies represent a failure to control the process of validating and registering only qualified citizen voters, thereby allowing persons to vote in the Ohio 2022 General Election in significant numbers who held apparently invalid and/or illegal registrations.

254. Petitioners believe and therefore aver that Respondents' failure to follow or enforce the law has resulted in election outcomes that are untrustworthy and unreliable. The state of Ohio's voting system in its present form cannot be trusted to produce reliable results under HAVA because Respondents will not follow the dictates of the Act, thus necessitating judicial intervention.

255.     A writ of *mandamus* against Respondent Attorney General Garland is appropriate in this case. Respondent Attorney General Garland has failed, and continues to fail, in forcing the state of Ohio to comply with federal laws regarding voting, including voting accuracy and accountability as is clear from how Ohio officials conducted the 2022 Ohio General Election.

256.     Petitioners believe and therefore aver that without judicial action, Respondents will do nothing to comply with HAVA and other federal and state statutes that ensure the integrity of Ohio's elections and the same issues evident from the 2022 General Election will call into question the validity of Ohio's 2024 General Election results.

257.     The scope of this request for a writ of *mandamus* is narrow: Petitioners seek a judicial order requiring Respondents, both federal and state, to follow the laws cited herein in conducting the 2024 and subsequent federal elections, and adequately investigate and remedy the problems exposed in and 2022 elections and detailed in this Petition.

IX.    **PRAYER FOR RELIEF**

WHEREFORE, Petitioners respectfully request that this Honorable Court formally recognize Ohio's voter registration rolls contained more than one (1) million apparent errors in the 2022 General Election. Further, that these apparent errors took the form of illegal duplicate registrations, incomplete or unknown addresses, registrations on or before the registrant's date of birth, age discrepant registrants, registrations on January 1st, registrations on a federal holiday, registrations on Sunday, registrations with modified dates of birth, registrants whose voter history inexplicably changed, registrants with registration dates altered backwards, and registrants with altered "unique" state voter identification numbers. Petitioners ask this Court to enter an order in *mandamus* compelling Respondents to ministerially correct the apparent errors evident from the 2022 elections data, ascertain to the Court's satisfaction the reasons why the 2022 errors occurred, and prevent those same or similar ministerial errors from recurring during the Ohio 2024 General Election and all subsequent federal general elections to ensure the integrity of Ohio's combined federal and state elections going forward for years to come.

Petitioners, additionally, seek pursuant to permissible causes of action under NVRA and HAVA, this Court order that the state of Ohio may not certify the 2024 General Election unless and until the relevant Respondents have demonstrated to the Court that the 2024 General Election and subsequent elections were conducted in conformity with federal and state law and with fewer than the maximum errors permissible. Petitioners further request that this Honorable Court order the state, and any subdivision thereof responsible for voter registrations, submit voter registration requests (and any existing registrations reasonably in question) to the Department of Homeland Security to verify the citizenship or immigration status of persons seeking registration to vote or who are presently on the state's voter rolls whenever there exist any reliable indicators that an applicant or registered voter may not be a U.S. citizen (*see*, 8 U.S.C. §§ 1644 and 1373(c)). Lastly,

Petitioners seek and order in *mandamus* requiring all public officials named as Respondents perform their duties as the law intended whether it be conducting federal elections in conformity with the law or investigating, and where warranted in their discretion, prosecuting persons or entities for failing to perform their duties in conformity to the law after being given timely notice to do so.

Respectfully Submitted,

Date: 9|4|2024                    By: _____

Bruce L. Castor, III
NDOH I.D. No.: 0103252
Thomas A. Will & Associates
6000 Town Center Boulevard, Suite 106
Canonsburg, Pennsylvania 15317
Telephone: (412) 281-5110
Facsimile: (412) 315-7708
Email: bcastor@thomasawill.com
*Counsel for Petitioners*